# BRADLEY, et al v. DAVIS, et al.

Circuit Court, Pinellas County.

November 19, 1952.

Ed W. Harris and Al W. Johannes, both of St. Petersburg, for plaintiffs.

Askew & Earle, St. Petersburg, for defendants.

ORVIL L. DAYTON, Jr., Circuit Judge.

Plaintiffs Bradley purchased from defendants Davis all the capital stock of Consumer's Cold Storage & Locker Co., a corporation. Plaintiffs' offer to purchase same for $70,000 was accepted by defendants and plaintiffs gave to defendants seven promissory notes of $10,000 each, dated June 1, 1950, and maturing January 2, 1952.

Under the terms of her late father's will plaintiff Jane S. Bradley was to receive on her 25th birthday, to wit, January 2, 1952, one-half of the principal of the trust fund held by the trustees of her father's estate for her benefit. The money to be received from this source was assigned to the defendants Davis as security for payment of the notes.

Pursuant to the contract of purchase plaintiffs obtained a term policy of insurance on the life of plaintiff Jane S. Bradley in the

sum of $70,000, payable to the defendants Davis as beneficiaries, to secure the payment of the seven notes in the event of the death of Mrs. Bradley prior to her 25th birthday.

The contract of sale provided for the transfer to plaintiffs as purchasers of all the capital stock of the corporation upon execution and delivery of the seven promissory notes which purchasers agreed to pay "at any and all events," but specifically from the money to be received from the trust fund.

Plaintiffs seek rescission and cancellation of the purchase contract on the grounds that the terms thereof were unjust and inequitable, that the terms violated the provision of the trust benefit accruing to Mrs. Bradley under the will of her deceased father, and upon the further ground that the promissory notes were nonnegotiable.

The bill of complaint charges that plaintiffs were induced to purchase the business upon certain representations made to them by defendants Davis, and that such representations were false. It is alleged that defendants represented to plaintiffs— (1) That the corporation had done as much as $125,000 gross business in one year and that plaintiffs could expect a net return of 10% of the gross business, or between $10,000 and $15,000 per year. (2) That plaintiffs were never given an opportunity to inspect the books and records of the corporation and that their request to make inspection was refused by defendants Davis, who assured plaintiffs that they would receive a profitable return upon their investment. (3) That the machinery and equipment was in good condition when actually it was in a bad state of repair, and that plaintiffs being without experience in the operation of the particular type of business relied on the representations of the defendants Davis. (4) That plaintiff Jane S. Bradley did not understand the nature of the documents which she signed and that she was induced to sign them because of the representations made to her by defendant Herbert T. Davis, Jr. who it is alleged represented to her that the business was a profitable one, that she could expect a good return upon her investment, and that her husband, as manager of the business, could earn a comfortable living and pay for the business from the profits to be derived from its operation.

Defendants Davis in their answer deny all allegations of fraud and allege the transfer of certain of the notes for value to one Frank H. Broadfield in his lifetime. By counterclaim defendants joined the trustees of the estate of McKinstry Simmons, deceased (father of the plaintiff Jane S. Bradley) and seek a decree re-

quiring plaintiffs and trustees to pay the notes from the monies to be received by Mrs. Bradley on her 25th birthday. In the alternative a decree is sought to compel Mrs. Bradley to procure the money which she was entitled to receive from the trust fund on her 25th birthday and to pay the same over to the defendants in the event the court should hold that the funds should be transferred from the trustees to the beneficiary, or to enter judgment against the Bradleys to be paid from the money to be received from the trust fund by Mrs. Bradley.

Plaintiffs, by amendment, made the executor of the estate of Frank H. Broadfield a party defendant. The executor filed an answer and counterclaim making the trustees defendants. The counterclaim states that Frank H. Broadfield in his lifetime acquired three of the notes and a one-half interest in a fourth note for full value before maturity, and a decree is sought requiring the trustees to pay the same from the funds to be received by Jane S. Bradley, or that a decree of specific performance be entered requiring Mrs. Bradley to procure the money from the trust fund, and to pay the notes therefrom, or that a judgment be entered against the Bradleys to be satisfied from such funds.

The court heard all the testimony which transcribed covers 850 typewritten pages. Approximately 50 exhibits were introduced in evidence and two full days were devoted to argument by counsel. I am indebted to counsel for the respective parties for their presentation of the evidence, as well as for their diligent research and able argument.

Plaintiffs urge that the circumstances which make the transaction unjust or inequitable are shown by the evidence, to-wit— (1) A wide difference between the sale price and the value of the business. (2) Deficiency in quantity of the subject of sale. (3) The financial condition and profitability of the subject of sale. (4) The alleged violation of the trust established by Mrs. Bradley's father. (5) The transaction was non-negotiable.

Defendants urge— (1) That if any disparity in the sale price and the value of the business existed the inequitable conduct of plaintiffs would bar cancellation of the contract by a court of equity. (2) That plaintiffs had full opportunity to investigate the value of the business before purchasing, and failed to do so. (3) That plaintiffs were guilty of laches so as to bar relief. (4) That plaintiffs failed to offer to restore the original status of the parties as condition precedent to their right to seek rescission by a court of equity. (5) That the trust fund established by Mrs. Bradley's father was assignable. (6) That the transaction was negotiable.

The outcome of this litigation will be determined, in my opinion, by the answers to the following three questions—

1. Do the terms of the contract of sale constitute a violation of the provisions of the will of Mrs. Bradley's deceased father in that a portion of the principal of the trust created by the will which she was entitled to receive on her 25th birthday was assigned by her to defendants?

2. Were the notes given by plaintiffs to defendants under the contract of sale negotiable?

3. Does the evidence support plaintiffs' claim for equitable relief by rescission of the contract in question?

To determine the first question a careful examination of the will which created the trust is necessary. Paragraph fifth (b) of the will directs the trustees to divide the remaining two-thirds of the principal (one-third of the estate being in trust for the widow of the testator) one-half for the use and benefit of his daughter Jane D. Simmons (Jane S. Bradley) and one-half for his son James Simmons. The trustees were given discretionary power to use the income from the trust for the support and education of each beneficiary and any remainder of such income to accumulate until the beneficiaries reach the age of 21 years, when $5,000 of the principal and all accumulated income shall be paid to the beneficiaries monthly until he or she reaches the age of 25 years. Upon reaching the age of 25 years, the trustees shall pay to each beneficiary one-half of the balance of the principal of the trust.

Paragraph seventh (i) of the will provides that no assignment or order by any beneficiary by way of anticipation of any part of the *income* of the trust shall be valid, but shall be paid by the trustees directly to the person entitled to receive it or deposited to the account of the beneficiary in some bank without regard to such assignment or order. It further provides that neither the *principal* or *income* can be attached by trustee process, garnishment or other proceedings while in the hands of the trustees. (Emphasis supplied.)

Plaintiffs urge that it was the manifest intention of the testator to deny the beneficiary any control over the principal of the trust until she reached the age of 25 years and until that time all control of the funds was vested in the trustees, that the assignment of the beneficial interest to be received by her on her 25th birthday should be nullified by this court because the "clear intent and definite purpose of the trust created by a father for his daughter" was to give the principal to his daughter when she reached 25 years of age—but until that time the trust was to be under the control and protection of the trustees.

It appears to this court that paragraph seventh (i) was intended to clarify the meaning of the testator expressed in paragraph fifth (b) and that if the testator had intended as urged by plaintiffs to restrict Mrs. Bradley from making any assignment of principal as well as income, he would have so stated in the document. From a careful reading of the instrument it appears that the language of the testator is such that a restraint is imposed only upon the assignment of income—"No assignment or order by any beneficiary by way of anticipation of any part of the *income* of the trust herein created shall be valid ... nor can the *principal or income* of said trust funds become attached by trustee process or garnishment or other legal proceedings while in the hands of the trustees." (Emphasis supplied.)

It is therefore the opinion of the court that the clear and manifest intent of the testator was to restrain his daughter from making any assignment of income from the trust. It appears to be equally clear that it was the testator's intent to restrict any attachment of principal or income by trustee process, garnishment or otherwise. Had it been the testator's intent to restrict the "assignment" as well as "attachment" of principal, in the opinion of the court he would have clearly and unmistakably stated such intention by the use of apt words. To hold that the one-half interest in the principal or corpus of the trust payable to Mrs. Bradley upon her attainment of the age of 25 years is "income," the assignment of which was restricted by the will, would be a new concept of the term "income." For the reasons stated the contract of sale is not violative of the trust instrument.

With respect to the second question plaintiffs contend that the notes are non-negotiable because payment is directed out of a particular fund of the trust. Defendants contend that the notes are negotiable and that the assignment of the beneficial interest in the trust as contained in the sale agreement provided only an additional security for payment.

Each of the notes appears to be negotiable on its face. Each is in writing and is signed by the makers. Each contains an unconditional promise to pay. The sale contract contains a provision whereby plaintiffs as makers of the notes agree to pay the notes "at any and all events."

It therefore appears that if the notes were payable only from the proceeds of the trust fund they would not be negotiable—for the reason that there would be no general liability against the makers. A note payable only from a particular fund is not an unconditional promise to pay. A note which contains an unconditional promise

to pay, together with a collateral agreement whereby the makers reiterate their unconditional promise to pay the notes "at any and all events," and pledge a particular fund as additional security for such payment, is in my opinion negotiable.

With respect to the third question the evidence discloses that at a chance meeting between the plaintiff James S. Bradley, Jr. and the defendant Herbert T. Davis, Jr. the matter of the sale of Consumer's Cold Storage & Locker Co. was discussed, Bradley stated his desire for a position as manager and when Davis, Jr. said that he and his father would not be interested in hiring a manager but were interested in selling the business because the condition of his health made it inadvisable for him to continue operating it Bradley expressed an interest in buying.

At a later date Bradley said he was very anxious to acquire the business but that his wife was not convinced that it was a sound investment. A dinner party was arranged at the Bradley home which Mr. and Mrs. Davis, Jr. attended. After dinner Davis, Jr. discussed the business with Mrs. Bradley, describing its operation to her.

Bradley stated that he tried to interest his brother-in-law, James Simmons, in the venture but was unable to do so. Bradley remarked that he could not understand why no one seemed to share his eagerness to acquire the business.

When thoroughly sifted, the principal representations made by the defendants appear to be—(1) That defendants had done approximately $125,000 gross business in one year. (2) That if plaintiffs conducted the business as had defendants they could reasonably expect a return of approximately 10% on the annual gross business. (3) That while the records of the company showed a loss for tax purposes, it was actually a profitable business, because defendants and their families obtained meats and vegetables from the plant without cost.

Thereafter the parties went to the defendants' attorney, where a proposal to purchase was prepared and submitted to the defendant Herbert T. Davis, Sr., the principal owner. In the conferences between the parties it appears from the testimony—(1) Defendants advised Bradley to examine the corporate records or to have them examined by a competent person. (2) Defendants advised plaintiffs to have an appraisal made of the assets of the business and Bradley stated to defendants that he had done so (later admitting that he had not). (3) Defendants further advised Bradley to survey the business potential of the trade area, including the Gulf Beaches.

Bradley admits that these suggestions were made but that he did not act on them. The evidence shows that Davis, Jr. agreed to remain with Bradley and assist him in the operation of the business, and that he did so until informed by Bradley that his services were no longer needed. It is also shown by the evidence that Davis, Sr. agreed to lend Bradley the sum of $10,000—to be used as working capital in the operation of the business—and that he actually lent Bradley a total of $15,000, only $2,000 of which has been repaid. The evidence further discloses that Bradley never at any time indicated that he was dissatisfied with his bargain, that this suit was filed only after a discussion between Bradley and Davis, Sr. during which the former requested a further loan and the latter in reply refused the loan and suggested a receivership to protect Mrs. Bradley's money—because of what Davis, Sr. termed the inefficient operation of the business by Bradley.

Inasmuch as Bradley's manner of operating the business was mentioned as Davis, Sr.'s reason for suggesting a receivership the evidence on that point will be reviewed. When plaintiffs acquired the business from defendants the corporation had two employees. Bradley eventually increased the personnel employed to fourteen. He abandoned defendants' suggestion that profitable operation of the business could be assured only if the mark-up was kept high and the overhead expense of the operation kept low and "enlarged the operation" of the business. The testimony shows that in the eight months of operation of the business by Bradley the corporation did a total of $140,000 gross business and during that period acquired debts of approximately $30,000, as a result of which a receiver was appointed, and the business eventually sold by the receiver to one Bruce Wertz. Further evidence of Bradley's management of the business showed that the springs were removed from the doors of the freezer rooms—he admitted that he removed the springs, but denied that he left the doors open. The testimony of Stedman, who did the repair and maintenance work for plaintiff during his operation of the business, was that he found the door springs removed and the doors left open, which prevented the efficient operation of the cold storage machinery. On direct examination Bradley was asked to describe an average day in his operation of the business soon after he assumed its management in June, 1950. He stated that the first customer was usually the Yacht Club and that he would make the delivery and thereafter remain at the club to drink coffee with the manager—"That would just about make up the morning." In the afternoon—"We would just sit in the office most of the day and watch while the employee, Ernie, would handle the customers." In his "enlargement program" he appears to have planned to reduce his mark-up on the merchandise

and increase his volume of business—the profit on the gross business, however, appears to have fallen far behind the increased cost of operation.

Plaintiffs' offer of restitution consisted of an offer to return the stock certificates, made to defendants long after the business had been sold by the receiver to Bruce Wertz and at the conclusion of the argument of this cause. Our Supreme Court has adhered to the rule that rescission and cancellation of contracts are harsh remedies and not favored by the courts, and that any unreasonable delay in exercising the right to rescind the sale which results in injury or disadvantage to the opposite party, or any action taken in continued recognition of the contract as a binding obligation, amounts to a ratification of the agreement and bars subsequent rescission. McDonald v. Sanders, 137 So. 122, Mizell v. Watson, 49 So. 149, and other cases.

There is no question from the evidence that plaintiffs failed to act promptly to exercise their right of rescission. Bradley testified —"At no time did I ever tell Mr. Davis, Jr. or Sr., that I was ever dissatisfied." Nor is there any question that such exercise of the right of rescission was delayed until it resulted in injury and disadvantage to the defendants, inasmuch as the filing of this suit appears to have been plaintiffs' first expression of dissatisfaction —after the assets of the corporation had been sold to another by the receiver.

That plaintiffs acted to ratify the contract as a binding obligation is clearly shown by Bradley's operation of the business for a period of approximately eight months and his borrowing approximately $15,000 from the defendant Herbert T. Davis, Sr.

In the opinion of the court plaintiffs' offer to return to defendants the capital stock certificates of the corporation, the assets of which had been sold to another at a receiver's sale, is not such an offer of restoration of original rights and former status to defendants as is required as a condition precedent to the rescission and cancellation of a contract by a court of equity.

As to plaintiffs' contention that Mrs. Bradley did not fully understand the nature of the documents which she signed, the testimony of Mrs. Bradley reveals— (1) That she read the agreement before signing. (2) That the contract which she and her husband signed was substantially the same as had been agreed upon between plaintiffs and defendants before going to the office of defendants' attorney. (3) That she understood that she was to have her life insured and for what purpose. (4) That Davis, Jr. told her that he had had members of his family on the payroll of the business,

and that if plaintiffs operated the business as had defendants, they could do $125,000 gross business per year, and should earn 10% net profit on the gross business. (5) That plaintiffs could make a profitable living if they operated the business as had the defendants. (6) That she was looking to her husband to take care of the business part of the transaction. (7) That the statements made by Davis, Jr. at the dinner party were substantially the same as her husband had previously made to her. (8) That she understood that she was assigning her beneficial interest in the trust fund established by her father as security for the debt shown by the seven promissory notes. Viewed in the light of these statements by Mrs. Bradley plaintiffs' contentions that she did not understand the nature of the documents which she signed and that she signed because of representations made to her by Davis, Jr. are untenable.

I do not find that there were fraudulent representations made by defendants to plaintiffs upon which plaintiffs relied to their detriment, but rather that plaintiffs refused to avail themselves of defendants' suggestions that they have the corporate books examined, that the assets of the business be appraised and that the business potential of the trade area be surveyed before completing the purchase. I am further of the opinion that plaintiffs' failure to receive a profitable return on their investment was not due to fraudulent misrepresentations by defendants, deficiency in quantity of the subject of sale, the financial condition or profitability of the business at the time of sale—but rather to the improvident management of the business by plaintiff James S. Bradley, Jr.

Bradley's testimony is replete with inconsistent statements. When confronted by a prior statement which was at variance with the one he was presently making, his explanation usually was that he was confused. With his offer of a document which he identified as a statement of the actual value of the business at the time of purchase (which he had made up from the invoices of the items of equipment purchased) he stated to the court that the document was offered in support of his statement of opinion of the value of the business as of the time of the purchase. The document was admitted only after he stated, in response to interrogation by the court as to whether he offered it as a statement of the value of the business at the time of purchase—"Yes, that's the value." Counsel for plaintiffs later told the court that the document was inaccurate and offered to withdraw it. The court ordered it to remain in evidence as reflecting on the credibility of the plaintiff Bradley.

Among other things, Bradley admitted on cross examination— (1) That the defendants Davis told him they had done approximately $125,000 gross business in "prior years" rather than in "the year

prior" as he first stated. (The evidence shows that in a certain prior year the corporation had done approximately $122,000 gross business.) (2) That the defendants told him he should make 10% profit on the gross business if he conducted the business as had the defendants—that is, he should keep his mark-up high and his overhead operating expense low. (3) That the machinery was new when purchased and in good working order when he first saw it. (4) That defendants told him it had been a profitable business for the Davis family.

Bradley further testified in response to questions by counsel for the defendants—Q. "Did you ever take any money out of the corporation for your personal use?" A. "No Sir."—Q. "You did not?" A. "No, Sir."—Q. "Isn't it a fact that you borrowed $3,000 from the corporation for your personal use, outside of the salary you were paying yourself?" A. "From time to time I had to borrow money from the corporation because my salary wasn't sufficient."

It further appears that Bradley on his deposition stated—"I took money out of the business, and I put a note in to keep track of it." At the final hearing he testified—"I may have answered that, but I meant that I borrowed money; there's no one note for $3,000 to my knowledge. I owed the company money but I don't know how much."

In a period of eight months the plaintiff Bradley as manager of the business did $140,000 of gross business. He acquired debts of the corporation in the approximate sum of $30,000, he gave himself a 25% increase in salary, he borrowed money from the corporation for his personal use which the evidence does not show to have been repaid—and in spite of these facts admitted by him to be true he maintained that his operation of the business was not extravagant.

On the question of the value of the business it is difficult to glean from the testimony of the witnesses much helpful information in fixing its value as a going concern. Witness Yarbrough testified only as to the cost of duplicating the refrigeration equipment of the plant—he did not attempt to place any over-all value on the business. The witness Stedman estimated the cost of the machinery of the plant at the request of plaintiffs and testified as a witness for defendants. His testimony like that of Yarbrough did not include any estimate of the *total* value of the business as a going concern, but only as to the physical assets of the plant, and was limited to the cost of the refrigeration machinery, nothing else, such as plumbing, electric work, cold rooms insulation, etc. Stedman further testified that he was called several times by Bradley to do repair work on the plant and that on several occasions he found the doors to the

freezer rooms left open. The only evidence of the value of the business as a whole was given by one Bruce Wertz, who described his purchase thereof at the receiver's sale for the sum of $18,000 as a "steal"—and placed its true value at $80,000 or $90,000.

Since the only testimony before me as to the over-all value of the business as a going concern, free and clear of all indebtedness, as it was at the time of the plaintiff's purchase, is that of Wertz, there being no competent evidence for plaintiffs to controvert Wertz' testimony, I find that at the time of the sale there was no disparity between the actual value of the plant and the price which plaintiffs agreed to pay.

With further reference to Bradley's many inconsistent statements the record reveals that he testified on his deposition for discovery that the prospectus of the business was given orally to himself and James Simmons—he later testified that it was in writing. On direct examination he testified that Davis, Sr. agreed to lend him $10,000 but that he only got $1,500—on cross examination he identified checks from Davis, Sr. payable to Consumer's Cold Storage & Locker Co. (dated after he took over the active management of the plant) totalling the approximate sum of $15,000. At one point he said he was never positive about anything, further stating that someone once told him that only a fool is positive and that he never committed himself in that direction. He testified that his testimony before the court was true, although it was at variance with his deposition for discovery, which was made under oath. His testimony on cross examination often varied from his statements on direct. He was the principal witness upon which plaintiffs' case must stand, and his many inconsistent statements, in my opinion, destroy his credibility as a witness.

Having heard all the testimony of all the witnesses and observed their demeanor on the witness stand, having heard the argument of counsel and examined the briefs submitted, having carefully read the record of the testimony taken herein and examined the exhibits introduced in evidence, I have concluded that—(1) The contract of sale is not violative of the provisions of the trust established for the benefit of the plaintiff Jane S. Bradley by her late father. (2) The notes are negotiable. (3) The evidence in the case is consistent with the finding that defendants did not overreach plaintiffs but on the contrary acted fairly and openly in their dealings with them. (4) That the failure of the business was the result of the improvident management by the plaintiff James S. Bradley, Jr. Cancellation and rescission of the contract of sale will be denied and the defendants and counterclaimants are entitled to the relief sought. An appropriate decree may be prepared from this opinion.